UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

   -v-                            :
                                                                         S3 14 Cr. 545 (CS)

SELIM ZHERKA, a/k/a "Sam Zherka,"   :
   a/k/a "Sammy Zherka,"

                                      :

               Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### GOVERNMENT'S SURREPLY IN OPPOSITION TO DEFENDANT'S PRE-TRIAL OMNIBUS MOTIONS

The Government respectfully submits this surreply to address new factual allegations made in the defendant's reply in support of his pre-trial omnibus motions. For the reasons set forth herein, none of those new factual allegations individually, collectively, or taken together with those in his initial motion papers warrants the relief he seeks.

**I. None of the new factual allegations in the defendant's reply entitles him to a taint hearing in connection with the DANY/FBI wiretaps.**

In support of his motion for a taint hearing in connection with the DANY/FBI wiretap, the defendant states in his reply papers – *for the first time* – that "our review of the wiretaps and interviews with individuals intercepted on the wiretaps provide strong reason to believe that the government questioned five additional persons between 2008 and 2010 – Antonio Simeone, Carmine Allesandro, Frank Longhitano, George Weir, and Maria Hale – based on information that the government learned from listening to wiretap conversations." Defendant Selim Zherka's Reply in Support of Pretrial Motions ("Def. Reply") at 6. We have canvassed all of our case

1

agents and can report to the Court that none of those individuals was interviewed in connection with the instant investigation (if, in fact, they were questioned by federal agents at all).

## II. None of the new factual allegations in the defendant's reply entitles him to a taint hearing based on claimed violations of the attorney-client privilege.

In support of his motion for a pre-trial evidentiary hearing to determine whether the Government obtained and made use of information in violation of the defendant's attorney-client privilege, the defendant's counsel – *for the first time* – sets forth in his reply papers particular matters as to which he claims Mark Pagani represented the defendant. As demonstrated below, nothing in the defendant's reply merits the requested hearing because he still (1) has not identified a single confidential, privileged communication that was disclosed to and used by the Government in this case or (2) identified or alleged any specific prejudice he has suffered as a result of such a disclosure.[1] And, as also demonstrated below, the defendant is not entitled to the requested hearing because the Government's investigation was not based on any privileged communications, and its proof at trial will not consist of any such communications.

### A. Governing Authority

The law is clear that a party who asserts the attorney-client privilege bears the burden of establishing all the essential elements of the privilege. *von Bulow v. von Bulow*, 811 F.2d 136,

---

[1] In his reply, the defendant also complains that the "government has not represented that it followed any procedures to ensure that Pagani did not provide attorney-client privileged information or documents in his proffer to the Government." Def. Reply at 14. In fact, procedures safeguarding the sanctity of any attorney-client privilege between the defendant and Pagani were employed. Pagani was represented by an experienced white-collar federal defense attorney each time we met with him. We informed that attorney at the outset that we did not wish to elicit any responses that would divulge privileged communications matters – assuming such communications existed – and would not ask questions of Pagani if we felt they would elicit such responses. At the same time, we informed the attorney for Pagani that if he believed we asked a question that elicited a privileged response, he should say so and terminate the questioning in that area. And that is precisely how the Government and Pagani's attorney interacted during the course of his proffer.

144 (2d Cir. 1987). Meeting that burden requires the submission of affidavits or other competent evidence to establish sufficient facts to prove the applicability of the privilege. *United States v. Davis*, 131 F.R.D. 391, 402 (S.D.N.Y. 1990); *Application of Minebea Co., Ltd.*, 143 F.R.D. 494, 503 (S.D.N.Y. 1992) (internal quotations and citation omitted). Conclusory or *ipse dixit* assertions are not enough. *In re Grand Jury Subpoena Dated Jan. 4, 1984*, 750 F.2d 223, 225 (2d Cir. 1984).

The mere existence of an attorney-client relationship does not transform every attorney-client communication into a privileged one. Indeed, an individual can give documents to an attorney without creating an attorney-client privilege thereby and without necessarily cloaking those documents in the privilege. *See United States v. Knoll*, 16 F.3d 1313 (2d Cir. 1994). And, a party asserting the attorney-client privilege with respect to documents must submit affidavits and/or other evidentiary materials providing, on a document-by-document basis, whatever evidence it has to support its claims of attorney-client or work-product protection. *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 492 (S.D.N.Y. 1993).

**B. Discussion**

In his reply papers, the defendant now lists several matters as to which he claims he was represented by Pagani and argues that the "fact" of this representation requires a hearing on taint. But this latest argument suffers the same fatal flaw of all that have gone before it: *the defendant fails to identify any specific document that the Government obtained (and was read by the trial team as opposed to an ethical wall agent or prosecutor) from Pagani or his law offices, or any statement the Government elicited from Pagani, that is in fact attorney-client privileged.* Accordingly, he has not met *his burden* of persuasion under the case law set forth above.

1. **Estate and Tax Planning**

Under the heading "Pagani Estate and Tax Planning for Defendant," the defendant states a number of propositions with which the Government does not quarrel.[2] It is not disputed that Pagani represented the defendant in connection with the creation of a family trust in 2009 and the assignment of various assets including a) the assets that are the subject of Counts One through Five of the Indictment, charging the defendant with making false loan applications and b) assets including the defendant's interest in the VIP Club that are the subject of Counts Thirty-One through Thirty Three of the Indictment, likewise charging the defendant with making false loan applications. But nothing in any of that suggests, let alone proves, that the Government violated the defendant's attorney-client privilege with respect to such matters. The defendant attaches to his reply papers a list of assets and liabilities in Pagani's handwriting, Hafetz Affirmation of March 9, 2015 ("Hafetz Aff."), Exhibit A, which includes a solitary reference to the Ryan case – "2000 Judg. v. SZ pers." – and another solitary reference to the defendant's interest in the VIP Club, as well as a typewritten chart of assets which references the defendant's ownership interests in Farmington Hills, Hafetz Aff., Exhibit B. It is not disputed that the Ryan case and the ownership of both the Farmington Hills apartment complex and the VIP Club are related to charges in the Indictment. There is, however, nothing in the handwritten notes or the typewritten document that remotely suggests they were intended to be confidential communications to an attorney for the purpose of seeking legal advice. They are simply lists of assets and liabilities that someone might recount for any number of purposes, including obtaining financial advice or

---

[2] Although, under a separate heading entitled "Tax Planning," *see infra*, the defendant argues that Pagani was retained by the defendant for tax advice, there is nothing under the subheading "Pagani Estate and Tax Planning for Defendant" that deals with tax planning *per se*.

applying for a loan.[3] And neither the defendant nor his counsel has stated that the information on those lists was provided by the defendant to Pagani in confidence for the purpose of obtaining legal advice.

Under this same heading, the defendant claims that Pagani represented him in connection with his "payment ... on promissory notes to the sellers in the alleged sham sales [related to the false loan applications charged in Counts One through Five of the Indictment]." And in support of this claim, he attaches to his papers an email he sent to Pagani relating to such payments. Hafetz Aff., Exhibit C. But, as explained below, this claim fails for a number of reasons.

Initially, a brief explanation of the transactions underlying the false loan application charges in Counts One through Five is in order. All of those transactions bore similar characteristics. Sisti and Scarpa would contract to purchase an apartment house from a seller. Before that transaction closed, they would contract to sell the apartment house to the defendant for a substantially higher price. The defendant would submit this second contract to North Fork Bank and seek a loan based on the inflated price. The bank would extend a loan, expecting the defendant to make a substantial down payment, *i.e.*, approximately 25% of the purchase price. The defendant would make it appear to the bank that he had paid the 25% down payments. In fact though, his equity checks, which he had given to Pagani (as attorney for Sisti/Scarpa) were returned to him such that the required 25% down payments were not made. Sisti and Scarpa did not entirely trust the defendant and feared that if he resold the property he might not pay them their share of the profits. Accordingly, they demanded that the defendant sign "loan" documents

---

[3] We note is this regard that Pagani was a trustee of the Trust, and in such capacity would have had possession of and access to lists of, and information about, all of the assets/properties in the Trust. Accordingly, the fact that lists of and/or information about the assets the defendant assigned to the Trust (almost everything the defendant once owned) were in Pagani's files does not indicate that they were privileged. To the contrary, there is no privilege between the grantor of a trust and a trustee for the trust.

indicating that they had "loaned" the down payment back to the defendant. If he welshed and refused to pay them their share of the profits on a resale, they planned to use these documents as proof that the defendant owed them the monies in question.[4] The fact that Pagani was involved in making payments on these "promissory notes" to Sisti and Scarpa years later – 2012 according to the defendant, Hafetz Aff. ¶ 8 – does not at all signify that Pagani was acting as his attorney in connection with these payments.

First, Pagani has told us that he was acting, not as an attorney, but as an escrow agent in connection with these transactions. According to Pagani, the defendant had substantial sums from the defendant in his escrow account and he was merely making payments from the account to others at the defendant's direction. Second, the email above to which the defendant adverts, Hafetz Aff., Exhibit C, does not demonstrate in the least that Pagani was acting as the defendant's attorney in connection with the payments in question. To the extent that it was sent not just to Pagani, but also to Sisti (rsllc@aol.com was Sisti's email address) it was clearly not intended as a confidential communication for the purpose of obtaining legal advice. Third, even if Pagani "represented defendant in connection with payment ... on promissory notes to the sellers in the alleged sham sales," Def. Reply at 10, any attorney-client privilege attaching to such representation would be vitiated by the crime-fraud exception. Pagani conspired with the defendant, Scarpa, Sisti, and Morales to defraud North Fork Bank by obtaining loans based on false loan applications which overstated the contract prices of the real estate the defendant was purchasing and the down payments he had made in connection with such purchases. And, Pagani pleaded guilty to just that (as did Scarpa, Sisti, and Morales). Any action taken by Pagani

---

[4] The "loan" documents would also provide cover for the defendant and his co-conspirators – however inadequate – in the event they were ever questioned about the fact that the downpayments had not actually been made.

6

or statements made by/to him in connection with the loan agreements described above was/were clearly in furtherance of the false loan application scheme and thus either not privileged; or, in the alternative, if privileged, the privilege was vitiated by the crime-fraud exception. Finally, it is ludicrous to suggest that the defendant believed in 2012 – well after he was aware of the grand jury investigation in this matter and both he and Pagani were represented by separate counsel in connection therewith – that Pagani was giving him legal advice with respect to the very transactions he knew were under investigation.

2. **Tax matters**

Under this heading, the defendant argues that he retained Pagani for tax advice and also notes that the Indictment charges the defendant with numerous tax crimes. For any number of reasons, however, there is simply nothing to this argument. First, the "proof" that the defendant retained Pagani for tax advice is an email from Pagani to Nick Puglisi, a tax preparer, wherein Pagani states: "This will confirm that as of 1/1/09 I have retained your firm as attorney for Selim Zherka and all related entities related to all accounting services and financial/tax advice." Hafetz Aff., Exhibit D. We note that that email is of questionable provenance. It is dated July 13, 2011, but purports to document a relationship that supposedly began two and a half years earlier, thereby *nunc pro tunc* bringing it under the attorney-client tent. Additionally, and more to the point, the defendant once again fails to specify any attorney-client privileged document or communication concerning this alleged representation that was inappropriately accessed by the Government.[5]

---

[5] Defendant incorrectly states that "[t]he government acknowledges that it called Puglisi to testify before the grand jury." Def. Reply at 12. Puglisi was not so-called, and the Government never stated that he was so-called. We stated that the "defendant's tax preparer testified before the grand jury concerning his preparation of the defendant's tax returns." Government's Memorandum of Law in Opposition to Defendant's Pre-trial Omnibus Motions at 4. An

7

### 3. Connecticut Lawsuit

Under this heading, the defendant argues that he had an attorney-client relationship with Pagani in connection with the collusive, fraudulent suit that Sisti brought against both the defendant and Sovereign Bank in the District of Connecticut, as evidenced by the fact that the docket sheet in that action shows an attorney – Richard G. Small, Jr. – from Pagani's firm was the defendant's counsel of record in that matter. Hafetz Aff., Exhibit E. Again, though, the defendant has failed to specify a single attorney-client privileged document or communication concerning this representation that was inappropriately accessed by the Government. And beyond that, even if he did, it would be to no avail. Pagani informed us that the lawsuit was a fraud from beginning to end and that he and the defendant were participants in that fraud. Accordingly, any attorney-client privilege would be vitiated by the crime-fraud exception.

### 4. Criminal investigations

Finally, under this heading, the defendant – remarkably – argues that he reasonably believed that when he discussed the criminal investigation in this case with Pagani, he was communicating with him "on the basis of his attorney-client privilege," Def. Reply at 13, and that he viewed Pagani "as a legal consultant on his defense strategy," *id.* The notion that the defendant deemed conversations with a coconspirator attorney-client privileged is incredible on its face and simply defies belief.

The defendant retained Kerry Lawrence, Esq. to represent him within a day of the search of Pagani's law offices and the simultaneous service of grand jury subpoenas on him on December 1, 2011. In December of 2013, the Government, at Lawrence's behest, met with him and the other members of the defendant's legal team – Peter Tillem, Robert Ray, and Kyle

---

individual associated with Puglisi's firm who prepared the defendant's tax returns, not Puglisi himself, testified.

Watters – to repeat for them an explanation of the putative charges in the case already provided to Lawrence. Thereafter, the defendant retained Mr. Hafetz and Gerald Lefcourt to represent him. And after that, the defendant retained Michael Martinez to represent him. Other attorneys also purported to represent the defendant in connection with proceedings in the District Court. Pagani was not amongst them. He has never represented the defendant in this case and could never do so. The defendant, who regularly appears *pro se* in one lawsuit after another that he has brought – with separate counsel representing related persons or entities – well knows that Pagani, who has himself been represented in this matter by counsel since on or about the date of the search of his law offices, could not and did not represent him in connection with the investigation herein. Notwithstanding all of that, the defendant attempts to show that he viewed Pagani as his counsel because he faxed to him the affidavit of a North Fork Bank employee obtained in preparation for his defense. But the fact that one co-conspirator shares with another information that he believes will be helpful to their joint and/or individual defense(s), does not at all signify that he believes the individual with whom he shares such information is acting as his attorney. Beyond that, the email in question is directed not just to Pagani, but also to Ted Zelman at the *Westchester Guardian* (the defendant's "newspaper")[6], thus indicating it was not intended to be a confidential communication for the purpose of seeking legal advice. Once again, the defendant fails to specify any attorney-client privileged document or communication concerning this alleged representation that was inappropriately accessed by the Government.

***

The defendant has thus listed a number of subject matters as to which he claims he was represented by Pagani, but the mere existence of an attorney-client relationship does not

---

[6] Zelman was, purportedly, the author of the *Westchester Guardian* article entitled "Prosecutors Elliot [*sic*] Jacobson and Perry Carbone UNETHICAL AND CORRUPT HYPOCRITES!!!!!"

9

transform every attorney-client communication into a privileged one. *Application of Minebea Co., Ltd.*, 143 F.R.D. at 503. And, more to the point, the defendant has utterly failed to demonstrate that the Government saw, let alone used, any particular privileged communication. It is not enough to say: "Pagani represented me on a certain matter. There are documents in the Government's possession that could conceivably relate to such a matter. Therefore, the documents are privileged." The defendant must connect the dots. He must show that a particular document was given by him to Pagani or that particular information was conveyed by him to Pagani, in confidence, for the purpose of obtaining legal advice. And that is something that now – after two assays – he simply has not done.

\*\*\*

Additionally, the relevant facts, as set forth below, demonstrate that the Government will not rely on any privileged communications whatsoever in proving its case and that the Government's case is not derived from any privileged communications.[7]

During 2006 and 2007, the defendant applied for and received a number of loans from North Fork Bank for the purchase of apartment house complexes in New England (the Ridgegate, Farmington Hills, City Vue, New Colony Court, and Marshall Apartments). In 2007, the defendant applied for and received a loan package from Sovereign Bank to purchase a group of apartment houses in Tennessee. The defendant is charged in Counts One through Six of the Indictment with false loan applications in connection with the referenced loans.

After a federal search warrant was executed on his law offices, Mark Pagani, Esq., accompanied by counsel, came to the United States Attorney's Office and proffered concerning

---

[7] Beyond that, the Government did not use or otherwise rely on, nor does it intend to use or otherwise rely on any of the documents attached to the Hafetz Affirmation submitted in connection with the Defendant's Reply.

the above real estate/loan transactions. Pagani informed us during his proffer that he did not provide legal advice to the defendant in connection with any real estate transactions to which the defendant was a party. And the defendant concedes that there was no attorney client-relationship between Pagani and him in connection with the real estate acquisitions in 2006 and 2007. Def. Reply at 11.

Proof that the defendant submitted false loan applications as charged in Counts One through Six will come from non-privileged documents such as real estate closing records, banking records, and trial testimony/ publicly filed documents from the Ryan case – all of which is not conceivably privileged – and from the testimony of cooperating witnesses, the testimony of Ryan's attorney, and admissions made by the defendant. [8]

In 2008, the defendant refinanced one of the Tennessee apartment houses that he had acquired in 2007 with a new loan from Sovereign Bank ("Sovereign"), and he is charged in Count Seven with submitting a false loan application in connection with that loan (i.e., a false statement of assets and income). Some of the false statements in question relate to the ownership of the New England apartment house complexes above purchased in 2006 and 2007 and the ownership of some of the Tennessee apartment house complexes above purchased in 2007. The proof that this application was false will come from tax returns and assignments of interests signed by the defendant – documents that are clearly not privileged) – and from the testimony of cooperating witnesses.

---

[8] The Government learned of the Ryan judgment from documents provided by Sovereign in connection with the 2007 Tennessee loans.

In 2009, the defendant created the Zherka Family Irrevocable Trust ("the Trust") and assigned almost all of his assets/entities to the Trust.[9] Thereafter, the defendant applied for and received from Signature Bank ("Signature") a number of loans to refinance properties owned by the Trust, submitting operating agreements for those entities and statements of his assets as part of the loan applications.[10] The defendant is charged in Counts Thirty through Thirty-Three with making false loan applications in connection with the referenced loans (false statements as to the ownership of the borrowing entity in Counts Thirty-Two and Thirty Three; false statement of the defendant's assets in Counts Thirty through Thirty-Three). Some of the false statements in question relate to the ownership of the New England apartment house complexes above purchased in 2006 and 2007 and the ownership of some of the Tennessee apartment house complexes above purchased in 2007. The proof that these applications were false will come from tax returns and assignments of interests signed by the defendant – documents that are clearly not privileged – and testimony of cooperating witnesses.

The tax charges in the Indictment are largely derivative of the false loan application charges in Counts One through Five of the Indictment inasmuch as the defendant is charged with overstating depreciation expenses with respect to the apartment houses in question and/or understating capital gains upon the sale of some of those apartment houses by using the same falsely inflated purchase prices he submitted to the lending banks as his bases for the purpose of computing depreciation expenses and capital gains. The balance of the tax charges are based on the defendant's long history of failure to file timely tax returns (as evidenced by his subsequent,

---

[9] The existence of the Trust was no secret. Court documents the Government received from Ryan's attorney are replete with references to it.

[10] Documents obtained from Capital One (the successor in interest to North Fork Bank) relating to the payoff of some of the loans relating to the New England apartment house complexes showed that the defendant had paid those loans with new loans from Signature, thus alerting the Government to the fact that the defendant had started taking loans from that bank.

often years late, filing of returns for the years in question) and his filing of false personal tax returns (as evidenced by his subsequent filing of multiple amended returns, with each amended return showing more income than the next, as well as copies of unfiled returns he submitted to Sovereign as part of his application for the Tennessee apartment house loans), all of which was known to Government at the outset of the investigation (before Pagani's law offices were searched or he was questioned).

The wire fraud relating to the Ryan judgment, charged in Count Thirty-Four, will be proved by evidence of the Ryan judgment (a publicly filed document), the documents creating the Trust, the defendant's assignments of interests in his assets/entities to the Trust, the transcript of a post-judgment deposition of the defendant taken by Ryan in order to discover his assets, documents demonstrating the truth/falsity of statements the defendant made during that deposition (none of which is conceivably privileged), an email from an attorney for the defendant to an attorney for Ryan, and from the testimony of Ryan's attorney.

Finally, the witness tampering charged in Count Thirty-Five will be proved by the typewritten Q & A generated by Jason Capuano (the defendant's private investigator) for Scarpa to sign and the testimony of cooperating witnesses.[11]

***

In sum, the defendant's motion for a taint hearing relating to claimed violations of the attorney-client privilege should be denied for two reasons: First, it should be denied on its face because the defendant has failed to meet *his burden of persuasion* on the privilege issue, *see, von Bulow v. von Bulow*, 811 F.2d at 144, that is, he has not identified a single communication that is in fact protected by the attorney-client privilege and was used by the Government in the

---

[11] The Government learned of this witness tampering and of the document in question from cooperating witnesses.

investigation and/or prosecution of this case. Second, it should be denied because the Government has demonstrated that its case – which stemmed from transactions as to which Pagani concededly did not represent the defendant – is not based on and/or derived from privileged communications.

### C. The search warrant application

Finally, the defendant is still not entitled to the affidavits in support of the Government's application for a warrant to search Pagani's law offices because he has not adequately alleged standing. As set forth in our response, *Knoll*, 16 F.3d 1313, makes clear that the mere allegation that a defendant transmitted documents to an attorney does not confer upon him standing to contest a search of the attorney's offices. The defendant only has standing to suppress documents in his attorney's offices that are subject to a valid claim of privilege. And nothing in the defendant's opening brief or his reply demonstrates that he has such a valid claim with respect to any particular document or documents . "Without an affidavit or testimony from the defendant, it is almost impossible to find a privacy interest [giving rise to standing]." *United States v. Hamilton*, 538 F.3d 162, 170-171 (2d Cir. 2008), quoting *United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006). And here the defendant has failed to provide such an affidavit or testimony, but instead has chosen to hide behind vague, generalized allegations about Pagani's supposed representation of him without identifying particular communications that are in fact protected by the attorney-client privilege and were used by the Government in this case. In the absence of an affidavit from the defendant adequately alleging standing, he should not be provided with the highly sensitive affidavits in support of the search warrant in question.

## Conclusion

The defendant's motions should be denied.

Dated: White Plains, New York
       March 18, 2015

        Respectfully submitted,

        PREET BHARARA
        United States Attorney
        Southern District of New York

By: _____
    PERRY A. CARBONE
    Co-Chief, White Plains Division

_____
ELLIOTT B. JACOBSON
Assistant United States Attorney

_____
ANDREW J. KAMEROS
Special Assistant United States Attorney

15